**UNITED STATES, Appellee,**

v.

**Dennis STADLER III, Airman First
Class, U.S. Air Force,
Appellant.**

No. 96–1059.
Crim.App. No. 31420.

U.S. Court of Appeals for
the Armed Forces.

Argued March 6, 1997.

Decided Sept. 29, 1997.

Crawford and Gierke, JJ., filed opinions concurring in the result.

For Appellant: *Major Gerald R. Bruce* (argued); *Colonel David W. Madsen* and *Captain Harold M. Vaught* (on brief); *Colonel Jay L. Cohen* and *Lieutenant Colonel Kim L. Sheffield.*

For Appellee: *Captain Steven D. Dubriske* (argued); *Colonel Theodore J. Fink* and *Lieutenant Colonel Michael J. Breslin* (on brief).

*Opinion of the Court*

SULLIVAN, Judge:

On October 24–25, 1994, appellant was tried by a general court-martial consisting of officer members at Kadena Air Base, Okinawa, Japan. Contrary to his pleas, he was found guilty of negligent dereliction of duty and larceny of military property in violation of Articles 92 and 121, Uniform Code of Military Justice, 10 USC §§ 892 and 921, respectively. He was sentenced to a bad-conduct discharge, confinement for one year, and reduction to E–1. On December 14, 1994, the convening authority approved the adjudged sentence. The Court of Criminal Appeals affirmed on May 8, 1996. 44 MJ 566.

On November 7, 1996, we granted review of the following issues:

## I

WHETHER THE MILITARY JUDGE ERRED WHEN, OVER DEFENSE OBJECTION, HE PERMITTED TRIAL COUNSEL TO CROSS–EXAMINE APPELLANT ABOUT APPELLANT'S FAILURE TO LOCATE AND PRODUCE GOVERNMENT EMPLOYEES, WHICH TRIAL COUNSEL THEN USED TO ARGUE A "MISSING–WITNESS" INFERENCE.

## II

WHETHER THE MILITARY JUDGE ERRED, TO THE SUBSTANTIAL PREJUDICE OF APPELLANT, WHEN HE PROHIBITED DEFENSE COUNSEL FROM INTRODUCING EVIDENCE CONCERNING THE SUBSEQUENTLY ADOPTED WRITTEN PROCEDURES FOR HOUSING OFFICE COUNSELORS.

Assuming, *arguendo*, that error or errors occurred in this case as averred by appellant, we hold that the record of trial clearly shows that he was not prejudiced. Art. 59(a), UCMJ, 10 USC § 859(a).

Appellant was charged with dereliction of duty for "willfully" failing to notify the Accounting and Finance Office at Kadena Air Base of changes to his status that affected his pay and allowances. This alleged misconduct occurred between May 1, 1993, and June 1, 1994, and involved Cost of Living Allowances (COLA)[1] and Off–Base Housing Allowances (OHA)[2]. He was also charged with stealing these allowances from June 1, 1993, to June 1, 1994, in an amount in excess of $100.00.

The prosecution introduced evidence that appellant was stationed at Kadena Air Base in Okinawa, Japan, in 1992, and was accompanied by his wife and later by his two children. It also showed that he lived in off-base housing and received both COLA and OHA. As a result of marital problems, he requested return of his dependents to the United States under the Early Return of Dependents Program (ERD) in February 1993. As part of this request, he signed a form *which notified him that he was not entitled to COLA or OHA and of his duty to report his changed status for COLA and OHA to the Accounting and Finance Office.* His request was granted, and his dependents left Okinawa around April 20, 1993. On May 1, 1993, he moved back on base but he continued to receive both the above allowances as before for over a year ($1000.00 extra benefit per month or $12,000 total).

Appellant's defense to the dereliction-of-duty and the larceny charges was that he made some honest mistakes. He testified that he did not read the statement of understanding he signed in February 1993, notifying him that he was not entitled to COLA and OHA and of his duty to report his changed status for COLA and OHA to the Accounting and Finance Office. He further testified that in June of 1993, he called Accounting and Finance on his own and was told by a "civilian Japanese lady" working there that he could continue to receive the COLA. He also testified that earlier he went through the Base Housing Office to acquire a dormitory assignment on base. He testified that he was *not* told by a "civilian black lady" who processed his request that he had to report his changed status for OHA to Accounting and Finance. These unnamed government employees were not called as witnesses by either the prosecution or defense. Moreover, both the government investigator in this case and appellant testified on cross-examination that no effort was made by them to contact these unnamed witnesses prior to trial.

The members found appellant guilty of dereliction of duty for "negligently" failing to report his changed status for pay and allowances to the Accounting and Finance Office. They also found him guilty of larceny of military money in excess of $100.00.

---

1. The record shows that a Cost of Living Allowance (COLA) is an entitlement measured by the number of dependents accompanying the servicemember at his duty station.

2. The record also shows that an Overseas Housing Allowance (OHA) is an entitlement that works with BAQ to pay a member's rent and utilities off-base.

———

Review was granted by this Court on two issues raised by appellate defense counsel. Consideration of these issues in light of the record of trial reveals that appellant actually makes three distinct legal arguments. First, he contends that the military judge erred by excluding defense evidence of the written office procedure for the Kadena Base Housing Office at the time of appellant's trial. Second, he argues that the military judge erred in allowing trial counsel to cross-examine appellant about his pretrial failure to contact witnesses who would purportedly exonerate him of the charged offenses. Third, he complains that the military judge erred in allowing trial counsel to make an improper "missing-witness" argument in his summation to the members.

We have considered the above claims by appellant in view of the entire record of trial before us. *See United States v. Dollente,* 45 MJ 234, 242 (1996); *United States v. Banks,* 36 MJ 150, 170 (CMA 1992). We conclude that these legal questions need not be addressed and resolved in this case. *See generally United States v. Harris,* 46 MJ 221 (1997); *United States v. Diaz,* 45 MJ 494 (1997). In our view, even if these legal claims are resolved in appellant's favor, neither separately nor together do they warrant setting aside his convictions. *United States v. Adams,* 44 MJ 251, 253 (1996)("Whatever test [for prejudice] is applied, the error was not prejudicial to this appellant.").

■ In this regard, we note that the excluded defense evidence would not have materially affected appellant's convictions for dereliction of duty and larceny. He was found guilty of negligently failing to report his changed status for COLA and OHA, and of stealing both those allowances in an amount in excess of $100.00. The excluded defense evidence pertained to notification of his duty to report his change in status and his mistake as to his entitlement for OHA alone. This defense evidence did not specifically rebut the Government's independent proof that appellant was notified prior to going to the Kadena Air Base Housing Office that he was no longer eligible for COLA and

OHA and had to report his changed status for these allowances to Accounting and Finance. Moreover, it did not rebut in any way the Government's case on the COLA. Accordingly, reversal of his convictions on this basis is not warranted. *See United States v. Miller,* 46 MJ 80, 83–84 (1997); *United States v. Ureta,* 44 MJ 290, 299 (1996).

■ Turning to the asserted improper cross-examination questions, we note that the military judge immediately commented on them on the record in the presence of the members. He clearly stated "the accused has no duty to produce any evidence in this courtroom . . . . but you must make sure you do not try to shift the burden to the accused to prove his innocence; that always rests upon the prosecution." He later instructed them that the burden was on the prosecution to prove that "the accused was not under the mistaken belief that he was authorized to receive these benefits." These instructions "cured" any error in the form of the challenged questions. *See United States v. Catlett,* 97 F.3d 565, 573 (D.C.Cir.1996); *United States v. Butler,* 71 F.3d 243, 255–56 (7th Cir.1995).

As for the averred "missing-witness" argument, appellant waived consideration of this complaint by failing to object during trial counsel's argument or immediately thereafter. *See United States v. Webb,* 38 MJ 62, 66 (CMA 1993), and RCM 919(c), Manual for Courts–Martial, United States (1995 ed.). Moreover, in the context of this record of trial, we are not convinced that, absent trial counsel's argument, appellant would not have been convicted. *United States v. Clark,* 982 F.2d 965, 969 (6th Cir.1993). Accordingly, in these circumstances, reversal is not warranted even if legal error occurred.

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

Chief Judge COX and Judge EFFRON concur.

CRAWFORD, Judge (concurring in the result):

I would squarely face the issues whether trial counsel's cross-examination and argu-

ment were improper. I would hold that the judge did not abuse his discretion in overruling the objection to the cross-examination of appellant and failing *sua sponte* to strike the argument by the prosecutor.

From the beginning of the trial to closing defense argument, appellant improperly received more than $12,000 (from June 93 to June 94)[1] in cost of living allowances (COLA) and overseas housing allowances (OHA). His defense for failing to report his dependents' return to the United States was mistake of fact. Appellant testified that the purpose of the COLA was to help pay for off-base living, whereas the purpose of the OHA was to assist in paying for off-base quarters. On documents relating to his family's move, appellant indicated that he understood that once his dependents returned to the United States, he was not entitled to COLA or OHA.

Individuals living in the Kadena Air Base area who move to off-post quarters or move from off-post to on-post quarters are processed through the Housing Office. During the processing to move off-base, they are told that if their status changes, that is, if they move on-base, they should go by "Finance and stop their allowances." If they are moving back into the barracks, there is an off-base clearance package which is required to be returned to the Housing Office. When they return the clearance documents, they are reminded orally of their responsibility to go by Finance. There is no checklist to remind them to go to Finance, or a written statement in the clearance documents stating that they should go by Finance.

Employees who process the paperwork both to move off-base and move back on-base are trained to tell those moving about stopping their allowances. These employees receive the same training as those at Finance and know that an individual who moves back into the barracks is not entitled to COLA or OHA.

To ensure individuals are correctly entitled to COLA and OHA, a recertification letter is sent to servicemembers. This requires them to recertify that they are living in off-post quarters. Sergeant Thompson testified that there was no doubt that a recertification letter was mailed to appellant. However, it was not returned. Sergeant Thompson testified that she had never heard any person say that a person on Okinawa with dependents back in the United States is entitled to COLA at the same rate as if their dependents were in Okinawa. It was clear that there was no written policy at the time appellant moved off-base and then moved back on-base. After appellant had moved back into the barracks, the clearance package was changed to notify servicemembers that they are required to go to Finance to stop the allowances.

In January and February 1993, appellant started having martial problems and arranged for an early return of his dependents (ERD) to the United States. This required a written request, justification, and approval. The request for ERD contained a "Statement of Understanding" signed by appellant: "I am not entitled to dependent rate Overseas Housing Allowance (OHA) or Cost of Living Allowance (COLA) effective the date my dependents depart Kadena [Air Base.]" That form also notified appellant of his duty to report to the Accounting and Finance Office "any change of status that would affect my pay and allowances. This includes, but is not limited to (1) divorce or separation agreements, (2) date dependents depart the overseas area, . . . ." Appellant's dependents left Okinawa on April 20, 1993.

Appellant's leave and earnings statements from July 1993 thru July 1994 show the following:

| Date | COLA | OHA | NET Monthly Ent |
|------|------|-----|-----------------|
| Jul 1993 | $552.49 | $667.90 | $1,483.67 |
| Aug 1993 | 553.54 | 674.40 | 1,540.96 |
| Sep 1993 | 561.58 | 725.90 | 1,617.11 |
| Oct 1993 | 489.72 | 671.90 | 1,569.21 |
| Nov 1993 | 495.70 | 646.12 | 1,167.75 |
| Dec 1993 | 498.67 | 633.34 | 1,093.99 |
| Jan 1994 | 484.58 | 650.61 | 1,358.68 |
| Feb 1994 | 473.68 | 664.99 | 1,370.20 |
| Mar 1994 | 640.75 | 757.92 | 1,494.67 |
| Apr 1994 | 564.50 | 698.68 | 1,167.54 |
| May 1994 | 613.01 | 731.86 | 1,568.81 |
| Jun 1994 | −17.36 | 0 | 888.71 |
| Jul 1994 | 429.88 | 0 | 875.14 |

1. Appellant's basic pay as an E–3 in 1993 was $948.90. His basic pay in 1994, starting in February, was $1,023.

From the net monthly pay entitlements, appellant sent $600 a month to his wife until June 1994, when the amount was $400 per month.

Prior to trial, appellant told Special Agent (SA) Mitchell that he was "aware that he was receiving COLA at the with-four-dependents rate, even though his dependents were no longer on the island." Appellant knew he was not entitled to COLA for off-base housing when he was living in the barracks. In a sworn written statement to agents of the Office of Special Investigations (OSI) appellant stated, "I realize I shouldn't have been receiving extra money." Continuing he said, "I have been receiving the extra money to make my ends meet." Appellant needed the extra money to help his wife. But appellant told investigators that a female at Finance told him he was entitled to "this [COLA] allowance." SA Mitchell stated that he attempted to obtain more information from appellant about the identity of the woman but was unsuccessful. The defense vigorously cross-examined SA Mitchell about his failure to verify appellant's call, and reasoned that appellant kept the money because of his call to the Accounting and Finance Office.

Appellant testified that he asked a woman with a Japanese accent about his COLA but not his OHA because he thought OHA was a housing-office responsibility. Appellant said that he did not know he was not entitled to either allowance until he went to the OSI office. On direct examination appellant denied being derelict in his duty in not reporting this to the Finance Office. He denied telling the agents that he was not entitled to the allowances. Appellant consistently testified that he thought he was entitled to the allowances because of his talk with the Japanese woman on the telephone. He said that he did not go look for the woman because he did not think that was his responsibility. Appellant testified that he signed the ERD request but did not read it.

On cross-examination appellant was asked whether he gave the correct information to the woman at the Accounting and Finance office. When the prosecution started to ask why appellant did not seek to find the one woman who could corroborate his story, the defense objected that the question was argumentative. The judge overruled that objection. The defense then said that " [t]he accused certainly doesn't have the burden" of proof. The judge responded, "[T]he accused has no duty to produce any evidence in this courtroom. . . . [The burden of proof] always rests upon the prosecution." The questioning then continued. There were no further objections until appellant was asked if he was telling the truth at trial.

As to appellant's failure to contact this exculpatory witness, the prosecution argued:

And he keeps coming up with phantoms. First we have the Accounting and Finance lady. . . . She gave me bad advice. There isn't one piece of evidence that he or anyone else made an effort to find her. Where is she? Simply put, she doesn't exist, members because he never went and called Finance and got that advice. . . .

* * *

There is a reason why no witness appeared. There's a reason why he had no name. And the reason is it's a lie. He simply didn't tell the truth. Because at OSI, he had to come up with some reason to justify what he had just said. Because they said, "Did you know you weren't entitled to the money?" "Yeah, I knew that." And then the full realization of just what he had said and to whom he had said it sank in, and so the excuses have to start coming out. Well, I called a woman over there. Then that's the last we ever hear of it until today.

Taking advantage of the judge's instruction at the time of the colloquy, the defense argued during closing argument the following:

[W]hy should you and your colleagues find Airman Stadler not guilty of dereliction of duty? Two reasons. The first reason, . . . is the fact that we've proven—the defense has proven, that Airman Stadler was not derelict in his duties. We've proven that. We didn't have to prove that. As the military judge told you, we could've sat back—he could've sat back with his law-

yers and not put on any evidence whatsoever. But we've proved it to you.

How have we proved it to you? He got up on the stand. He testified under oath. He subjected himself to cross-examination by the prosecution, and was even willing to answer questions from you; and he told you the truth.

What did he tell you? He told you that he called Accounting and Finance in June of 1993 and he talked to a civilian employee there. And he had some questions about his COLA. He had informed her that he was living in the dorms, that his dependents had moved back to the States, wasn't sure whether or not he should be getting this money; so, he asked her, and she told him he's entitled to the money so long as he's not divorced. He wasn't divorced then, and he's certainly not divorced now.

Now, the prosecution gets up here and says, well, we didn't see any witness that came in and testified—any civilian witness that came in and testified from Accounting and Finance. We don't have the burden of proving anything; anything whatsoever. The only evidence that we have on this issue, mind you, is Airman Stadler's testimony. That's the only evidence.

## Discussion

Issue II centers on the cross-examination of SA Mitchell and appellant, as well as the arguments made by both sides. The key to the defense theory at trial was appellant's assertion that he had received permission from a woman with a Japanese accent at the Accounting and Finance Office to receive the additional COLA. Appellant did not ask her about the additional OHA.

Conduct of the parties before trial or at trial may raise negative inferences. For example, pretrial conduct such as flight,[2] misleading or false utterances,[3] subornation of perjury,[4] or silence at the time of the arrest[5] may raise negative inferences. Pretrial conduct may consist of "gross negligence" such as destroying an accused's urine sample.[6] Conduct giving rise to a negative inference may also include failure to produce evidence in one's possession or failure to call a particular witness.[7] The key is whether allowing the trier of fact to draw a negative inference from this evidence would violate the Consti-

**2.** *United States v. Buchana*, 19 USCMA 394, 397, 41 CMR 394, 397 (1970) (citations omitted), quoting 1 Wharton *Criminal Evidence* § 139 (12th ed.1955) (holding "[e]vidence of flight is admissible to establish an accused's guilt of the offense charged. While evidence of flight does not give rise to a presumption of guilt, it is 'a circumstance which when considered together with all the facts of the case may justify the *inference* of the accused's guilt.' "); *United States v. Johnson*, 6 USCMA 20, 24, 19 CMR 146, 150 (1955) (quoting *Vick v. United States*, 216 F.2d 228, 232 (5th Cir.1954)) (holding that "[f]light is, of course, an indication of consciousness of guilt, but its probative effect 'depends on the conditions and [the] motive[s] which prompted it.' " (Last bracketed parts included in original quotation.)).

**3.** *United States v. Colcol*, 16 MJ 479, 484 (CMA 1983) (citation omitted) (holding that although "false statements by an accused in explaining an alleged offense may themselves tend to show guilt[,]" a "general denial" of illegal activity "does not demonstrate any consciousness of guilt"); *United States v. Hurt*, 9 USCMA 735, 773, 27 CMR 3, 41 (1958) (citations omitted) (holding statements appellant made which later proved false were "clear-cut evidence of a 'consciousness of guilt' ").

**4.** See, e.g., *United States v. Dittrich*, 100 F.3d 84, 86 (8th Cir.1996); *United States v. Collins*, 90 F.3d 1420, 1428 (9th Cir.1996); *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 922 (3d Cir.1985).

**5.** *Fletcher v. Weir*, 455 U.S. 603, 607, 102 S.Ct. 1309, 1312, 71 L.Ed.2d 490 (1982)(holding it was permissible to impeach by post-arrest silence not proceeded by *Miranda* warnings).

**6.** *United States v. Manuel*, 43 MJ 282, 288 (1995); cf. *California v. Trombetta*, 467 U.S. 479, 488–89, 104 S.Ct. 2528, 2533–34, 81 L.Ed.2d 413 (1984) (holding failure to preserve defendant's breath samples for breath-analysis test should not result in suppression of results unless officers were acting in bad faith, the evidence would have exculpated the defendant, and there were no alternative means for demonstrating innocence).

**7.** *State v. Blair*, 117 Wash.2d 479, 816 P.2d 718 (1991)(holding prosecution may argue that booklets seized from defendant with handwritten notations and numbers were a ledger of his drug dealings if defendant could have introduced witnesses to the contrary).

tution, a rule of evidence, or a procedural rule.

### Constitutional Concerns

It is unconstitutional for the prosecution to comment on failure of the defendant to testify.[8] "But where ... the prosecutor's reference to the defendant's opportunity to testify is a **fair response** to a claim made by defendant or his counsel, we think there is no violation of the privilege."[9] The Fifth Amendment does not bar comment on the defendant's failure to produce material testimony other than his own.[10] The Fifth Amendment protects the defendant from providing "evidence of a testimonial or communicative nature."[11] The converse is also true. A defendant is not protected under the Fifth Amendment from providing evidence which is not of a testimonial or communicative nature. A factfinder may infer consciousness of guilt from an accused's refusal to appear in a lineup,[12] to shave his beard,[13] to stand,[14] or to produce handwriting samples[15] or fingerprints.[16]

### Evidentiary Issues

The key evidentiary question is whether the negative inference is relevant. From a common sense point of view the judge also must consider the expectations of the triers of fact. During deliberations, the factfinders could reason that failure to produce evidence creates a negative inference.[17] The parties could advance alternatives to this inference at trial. The failure to produce evidence has an impact on the jury. Thus, there is a logical relationship between failure to produce the evidence and the argument of counsel.

Even where the evidence is relevant, the judge has discretion under Mil.R.Evid. 403, Manual for Courts–Martial, United States (1995 ed.), to exclude the evidence if the probative value of the evidence is outweighed by confusion, waste of time, or the prejudicial quality of the evidence. The estimation of probative value versus the other factors is difficult to make. In some cases it may depend upon counsel's articulating why extra time should be taken to promote the negative inferences. The military judge should not be reversed for a ruling on Mil.R.Evid. 403 unless his action is "found to be 'arbitrary, fanciful [and] clearly unreasonable'."[18]

### Procedural Aspects

The procedural issues involving negative inferences are (1) whether there should be a hearing regarding the negative inference and (2) what instructions should be given. The Supreme Court's decision in *Graves v. United States*[19] outlines when an inference is permitted based on a missing witness, but it gives little guidance to judges on the proper scope of the argument or what instructions might be given.

8. *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

9. *United States v. Robinson*, 485 U.S. 25, 32, 108 S.Ct. 864, 868–69, 99 L.Ed.2d 23 (1988) (emphasis added).

10. *See, e.g., United States v. Lyon*, 397 F.2d 505, 509 (7th Cir.1968).

11. *Schmerber v. California*, 384 U.S. 757, 761, 86 S.Ct. 1826, 1830–31, 16 L.Ed.2d 908 (1966).

12. *See, e.g., People v. McGee*, 245 Ill.App.3d 703, 185 Ill.Dec. 635, 640, 614 N.E.2d 1320, 1325 (1993) (holding prosecutor may introduce evidence of refusal to participate in a lineup as consciousness of guilt).

13. *See, e.g., Commonwealth v. Brown*, 544 Pa. 406, 676 A.2d 1178, 1183 (1996) (holding jury may infer consciousness of guilt from defendant's refusal to shave for line-up).

14. *See, e.g., Schmerber*, 384 U.S. at 764, 86 S.Ct. at 1832.

15. *See, e.g., Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967).

16. *See, e.g., Schmerber v. California, supra.*

17. Saltzburg, *A Special Aspect of Relevance: Countering Negative Inferences Associated with the Absence of Evidence*, 66 Calif. L.Rev. 1011, 1012 (1978); *see also* Kassin, *The American Jury: Handicapped in the Pursuit of Justice*, 51 Ohio St. L.J. 687, 699–700 (1990).

18. *United States v. Miller*, 46 MJ 63, 65 (1997); *see also United States v. Robinson*, 560 F.2d 507, 515 (2d Cir.1977).

19. 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893).

In the military, in contrast to civilian jurisdictions,[20] there is no requirement for a hearing before a party may draw a negative inference from the absence of evidence. In the future, military judges may require a party to obtain permission in advance before allowing comment on the absence of a witness.[21] Additionally, where an objection is made, a court may offer the opponent an opportunity to explain the witness' absence at an Article 39(a), Uniform Code of Military Justice, 10 USC § 839(a), session.[22]

When an objection is made regarding a negative inference, the judge may strike the testimony leading to the inference, grant a continuance, give limiting instructions, prohibit the party from making the argument, or call the witness on behalf of the court. But there is no *sua sponte* duty to do any of the above. Here, the witness was equally available to both sides, and the judge did not abuse his discretion in overruling the defense objection.

The identity of the woman with a Japanese accent was peculiarly within the knowledge of appellant. Certainly the Government had no description of the individual because appellant himself had only the sound of her voice as a means of identification. Under the military right to compulsory process, appellant had the same right to compel the production of this witness as the Government. Art. 46, UCMJ, 10 USC § 846. It was perfectly proper for the prosecution to cross-examine appellant about whether he was telling the truth when he testified that he had permission to receive more than $1,000 a month, twice his basic pay, from the unknown woman at Finance. It was also proper to question appellant about why he did not assist the investigators in locating this witness.

In some ways, this cross-examination was in reply to the vigorous cross-examination of SA Mitchell, from which the court members would also draw certain inferences. One of those inferences might have been that SA Mitchell should have followed up with appellant, with Finance, or others regarding the identity of the woman who allegedly spoke with appellant about his additional COLA. Or the members might question why the defense did not search for this individual who supposedly gave appellant permission to continue to receive a COLA after his dependents had moved back to the United States. In any event, the cross-examination of appellant was at least partially triggered by the cross-examination of the agent.

Again, the cross-examination of appellant raised a number of inferences to be considered by the court members. Because of these conflicting inferences, the judge did not abuse his discretion by overruling the objection to the cross-examination of appellant. The judge had no *sua sponte* obligation to strike the argument by the prosecutor.

GIERKE, Judge (concurring in the result):

In my view we need not resort to harmless-error analysis in this case, because the military judge did not err.

This case involved a factual issue whether a conversation with a witness occurred. Appellant testified that he relied on bad telephonic advice from a woman at the base finance office. Trial counsel attempted to persuade the court members that the telephone conversation never happened. Trial counsel argued, "Where is she? Simply put, she doesn't exist, members because he never went and called Finance and got that advice."

In the first granted issue appellant asserts that the missing-witness inference was improperly used against him. In my view the missing-witness doctrine was not invoked and does not apply to this case. Trial counsel did not suggest that an absent witness would have testified adversely to the defense. Trial counsel properly argued that appellant was lying about his conversation with someone at base finance and that the conversation never happened. The military judge properly cau-

**20.** See e.g., *Lawson v. United States,* 514 A.2d 787, 789 (D.C.App.1986).

**21.** See, e.g., *United States v. Martin,* 696 F.2d 49, 52 (6th Cir.1983).

**22.** See, e.g., *Christensen v. State,* 274 Md. 133, 333 A.2d 45, 46 n. 1 (1975); *State v. Clawans,* 38 N.J. 162, 183 A.2d 77, 82 (1962).

tioned the members that the burden does not shift to the defense to prove innocence but remains with the prosecution. In my view there was no error.

Furthermore, even if the argument of trial counsel is construed as commenting on the failure of appellant to produce witnesses, such argument would have been proper in this case. This Court has unanimously held, "It is well established that the government may comment on the failure of a defendant to refute government evidence or to support his own claims." *United States v. Webb*, 38 MJ 62, 66 (CMA 1993), quoting *United States v. Coven*, 662 F.2d 162, 171 (2d Cir. 1981). Appellant claimed that he kept the allowances because he relied on bad advice from a woman at the base finance office. The noncommissioned officer-in-charge of the base finance office testified that appellant's telephone inquiry would have been answered by one of two women working as customer service representatives. Defense counsel took the agent of the Office of Special Investigations to task for not tracking down and interviewing the two women. In my view it was fair comment under *Webb* for trial counsel to point out that appellant made no effort to contact the witness who could back up his claim.

With respect to the second granted issue, I believe that the military judge acted within the limits of his discretion. Defense counsel wanted to introduce evidence that the unwritten policy of referring servicemembers to the base finance office was reduced to writing after appellant had moved from his off-base quarters to an on-base dormitory. Although trial counsel invoked Mil.R.Evid. 407, Manual for Courts–Martial, United States (1995 ed.), in his objection, the military judge excluded the evidence on the basis of relevance. The military judge correctly observed that there was no change in policy. The only change was that the unwritten policy was reduced to writing. The military judge permitted the defense to establish by cross-examination of the government witness and by direct examination of its own witness that the policy was unwritten, that it may have been misunderstood, and that it may not have been followed. Thus the military judge allowed the defense to fully explore the real issue: whether the policy was understood and followed by Housing Office counselors. In my view the military judge did not abuse his discretion by excluding marginally relevant evidence of events that happened after appellant was processed through the Housing Office.

For the foregoing reasons I join in affirming the decision of the court below. Accordingly, I concur in the result.